**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW M. PEARSON,<br><br>             Plaintiff,<br><br>v.<br><br>ACE AMERICAN INSURANCE COMPANY a/k/a CHUBB,<br><br>             Defendant. | Case No. |

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Matthew M. Pearson files this Complaint against Defendant Ace American Insurance Company ("Ace" or "Defendant") on his personal knowledge and on information and belief as to all other facts as follows:

### I.     PRELIMINARY STATEMENT

1. Ace, Mr. Pearson's insurance provider, wrongfully denied coverage for damage to the engines on Mr. Pearson's marine vessel. The vessel ran aground in April 2022, resulting in sudden engine shutdown and severe mechanical stress. This event caused engine damage that remained latent until it was discovered during an inspection in December 2024.

2. Not only did Ace wrongfully deny coverage to Mr. Pearson, Ace failed to conduct a fair and neutral investigation of the engine damage, improperly relied on a limited-purpose survey process, and caused significant delays during the claim reporting process.

3. As further set forth, Mr. Pearson seeks a declaration that the parties' insurance contract covers the latent damage to the vessel's engines, damages in excess of $500,000, and all other appropriate relief.

## II.   PARTIES

4. Plaintiff Matthew M. Pearson is a citizen and resident of Harrison, Westchester County, New York.

5. Defendant Ace American Insurance Company, also known as Chubb, is a Pennsylvania corporation with a principal place of business at 436 Walnut Street, Philadelphia, Pennsylvania.

## III.   JURISDICTION AND VENUE

6. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

7. Venue is proper in the Southern District of New York because a substantial part of the events or omissions giving rise to Mr. Pearson's claims occurred in the District.

## IV.   FACTUAL BACKGROUND

**A. The Policy**

8. In 2010, Mr. Pearson acquired a 58-foot 2003 Sea Ray 560 Sedan Bridge ("Vessel").

9. Since March 2010, Mr. Pearson has continuously insured the Vessel exclusively with Chubb.

10. Ace acquired Chubb in 2016 and thereafter issued a replacement value marine policy covering the Vessel, including during the 2022–2023 policy period.

11. The parties' Chubb Masterpiece replacement value Policy for the April 2, 2022, to April 2, 2023, term is attached hereto as **Exhibit 1** (the "Policy").

12. If the Vessel is partially damaged, the Policy provides that Ace "will pay the reasonable cost to repair or replace, whichever is less, the damaged parts[.]"

2

13. The Policy "insure[s] ensuing covered loss due to fire, explosion, sinking, demasting, collision or stranding[,]" and it "provide[s] coverage for damage to engines[.]"

14. Ace has continued to insure and presently insures the Vessel.

## B. April 2022 Grounding

15. On April 28, 2022, the Vessel ran hard aground on a mud and sand bank while traveling at a cruising speed of approximately 25 knots in North Carolina waters. The impact was violent and resulted in an immediate, total cessation of forward movement, causing the engines to stall instantly and preventing the essential manufacturer-recommended cooling period. The force of this sudden stop damaged the interior and operational components of the Vessel. The deceleration was significant enough to propel heavy interior furniture through a sliding glass door, shattering it, and to bend the helm wheel downward into a deformed state. The captain and Mr. Pearson were both behind the helm and suffered severe bruising after they were thrown against the helm.

16. Immediately after the grounding event, the Vessel was hauled into a local repair yard to fix the underwater running gear so that it could be driven back to New York.

17. In May 2022, immediately after returning the Vessel to New York, Mr. Pearson contacted Bayside Diesel Service to inspect the damage. Initial technical inspections immediately following the loss revealed warning signs of trauma to the engines.

18. During the May 2022 site visit, technicians from Bayside Diesel Service inspected the Vessel. The technicians noted engine alarms and heavy white smoke emanating from the Vessel, symptoms they associated with internal engine distress. The technicians further noted that sudden impact engine failure may have damaged the Vessel during the April 2022 grounding event but that the damage may not yet be detectable.

19. Mr. Pearson and Bayside Diesel Service scheduled the Vessel for a more thorough maintenance and inspection appointment at the earliest available date in July 2022.

20. In or about May 2022, Mr. Pearson promptly notified Ace of damage to the Vessel after the grounding event, submitted an insurance claim, and communicated his concerns about potential engine damage from the sudden impact. Mr. Pearson also notified Ace that the Vessel was scheduled for inspection at Bayside Diesel Service's maintenance and repair shop in July 2022.

21. The Vessel remained docked or underwent minimal low-stress use for the purpose of transport from May 2022 until July 2022.

22. On May 24, 2022, Ace's claims adjuster or surveyor, George Stafford, inspected the Vessel for the first time at the Beach Point Yacht Club in Mamaroneck, New York.

23. In July 2022, Mr. Pearson delivered the Vessel to Bayside Diesel Service in Mystic, Connecticut, where Mr. Stafford inspected the Vessel for the second time.

24. After the July 2022 inspection, Bayside Diesel Service confirmed sporadic compression and extremely low compression in the Vessel's port engine. Despite these technical red flags, the certified mechanic did not advise an immediate engine teardown. Instead, the technician instructed Mr. Pearson to operate the Vessel for an additional 50 hours before resampling oil and performing a major service.

25. Mr. Stafford knew of the suspected engine damage and conducted a cursory inspection of the Vessel.

26. From July 2022 to November 2024, Mr. Pearson operated the Vessel for less than 50 hours, in low-stress circumstances, in and around New York City and Long Island, during which the Vessel continued to experience intermittent alarms for boost pressure and persistent white

exhaust smoke. These ongoing issues further validated Mr. Pearson's initial analysis, which he reported to Ace, that the grounding caused substantial internal damage to the Vessel's engines that had not yet been fully uncovered.

27. From April 15, 2024, through October 31, 2024, the Vessel remained docked in its seasonal slip in Fire Island, New York.

28. During that period, Mr. Pearson continued coordinating with Ace and third-party vendors to repair additional damage caused by the April 2022 grounding. He also interviewed several MAN diesel technicians in search of a qualified service facility closer to him than Bayside Diesel Service. Through that process, he was introduced to Heavy Duty Systems ("HDS"), a certified MAN diesel engine dealer located in Amityville, New York.

29. In or about August 2024, the 50-hour monitored run period was complete and HDS came to inspect the Vessel at Fire Island. HDS advised that the Vessel undergo a major service at the conclusion of the boating season, as Bayside Diesel Service previously had prescribed.

30. On or about November 10, 2024, the Vessel was transported from Fire Island to HDS's facility in Amityville, New York.

31. HDS scheduled the service and inspection for December 2024.

C. Discovery of Latent Engine Damage

32. In December 2024, HDS performed the major service and inspected the Vessel's internal components. After dismantling the Vessel's engines, HDS technicians discovered catastrophic damage as a result of a singular, high-intensity trauma event. The inspection revealed 17 cracked cylinder heads out of 20, which indicates a sudden and massive engine failure rather than gradual wear and tear.

33. Further testing by HDS confirmed that 15 of the 20 cylinders failed standard leak-down tests, which indicated a massive loss of internal pressure. The technicians' internal visual inspection found that all 20 cylinder-liners evidenced coolant intrusion. These findings established that the engine damage had been masked during initial exterior inspections immediately after the April 2022 grounding event.

34. The certified experts at HDS concluded that the engine damage was the direct result of a "Heat Soak" event that occurred during the April 2022 grounding. When the engines were forced into an immediate shutdown from high speed, mud from the grounding blocked the cooling intakes. This prevented seawater from circulating, which caused internal temperatures to spike to dangerous levels and resulted in the thermal shock that cracked the heads.

35. Technical consultations with corporate offices further supported this conclusion of a singular catastrophic cause. While a single cylinder head might reasonably fail after extensive use, experts concluded that the simultaneous failure of 17 heads on the Vessel's two engines, both with only 1,300 hours, is not plausible under ordinary operating conditions.

36. Faced with the discovery of these dangerous defects, Mr. Pearson was placed in an untenable position. To ensure the Vessel remained saleable and safe for operation, he was forced to commission immediate repairs. Mr. Pearson borrowed hundreds of thousands of dollars from his personal retirement funds to pay for the necessary parts and labor, which approached $500,000 in total costs.

37. HDS advised Mr. Pearson to engage a surveyor to document the damaged engine components. Mr. Pearson was then introduced to a surveyor, Ken Weinbrecht.

38. Mr. Weinbrecht visited HDS's repair shop to view the Vessel and photographed the damaged engines while they were deconstructed.

39. Mr. Pearson notified Ace that the engines were deconstructed and available for inspection, and that he delayed repair work until Ace had the opportunity to inspect the damage.

40. Ace informed Mr. Pearson that it would not send Mr. Stafford or any other surveyor to inspect the damage.

41. Mr. Pearson then authorized the necessary repairs to the engines.

**D. Ace's Denial of Coverage**

42. In early 2025, after Mr. Pearson informed Ace of the severity of the latent engine damage and the costs of repair, Mr. Pearson requested coverage. Ace interpreted Mr. Pearson's request as a supplemental claim for coverage after the April 2022 grounding event.

43. On February 18, 2025, Ace issued a formal denial of Mr. Pearson's supplemental claim.

44. Ace's denial of coverage is contradicted by the extensive and meticulously documented service history of the Vessel, which Mr. Pearson reported to Ace.

45. Records in Ace's possession confirm that Mr. Pearson expended more than $100,000 on three major services since acquiring the Vessel in 2010. This history refutes any claim of habitual maintenance failure and demonstrates a consistent pattern of high-level professional care.

46. The Vessel's oil analysis reports remained within normal parameters for years before the grounding, and issues developed only immediately after the April 2022 incident. The temporal and technical link between the impact and the failure is clear and substantiated by multiple expert reviews. Despite receiving this corrective information, Ace did not reconsider its denial of coverage.

### E. Compromised Dispute Process

47. After Ace initially denied Mr. Pearson's supplemental claim, Ace informed Mr. Pearson's insurance agent that Mr. Pearson must engage in a survey process if Mr. Pearson challenged Ace's denial of coverage, citing a "survey clause" as the governing authority.

48. Mr. Pearson believed the process to be an impartial limited-purpose survey to value the damage to the Vessel's engines.

49. Ace utilized the survey process to steer the coverage dispute into a specific three-panel review consisting of two surveyors and an umpire, all with ties to Ace.

50. Despite multiple requests from Mr. Pearson and his insurance agent, Ace failed to provide a complete copy of the 2022–2023 Policy containing the provision contemplating a survey process. By withholding the governing documents while directing the procedural rules, Ace ensured that Mr. Pearson was forced to navigate the dispute without a clear and complete understanding of his contractual rights.

51. The survey process began in February 2025. Under the survey clause, each party selected an independent marine surveyor, and those two surveyors selected a third surveyor to serve as the umpire. A written agreement signed by any two of the three would determine the amount of the damage to the Vessel's engines.

52. The integrity of the claim review process was undermined by the selection of the survey panel members. Mr. Pearson believed Mr. Weinbrecht would serve as his independent surveyor and expert advocate. Mr. Pearson asked for retainer invoices multiple times, but Mr. Weinbrecht said, "I am not going to charge you unless I get something for you out of [Ace]." Mr. Weinbrecht explicitly assured Mr. Pearson that he would assist him in navigating the complex claim review process.

53. Mr. Pearson's surveyor, Mr. Weinbrecht, and Ace's surveyor, Mr. Stafford, jointly chose Bill Trenkle as the third surveyor or "umpire."

54. Mr. Weinbrecht informed Mr. Pearson that he and Mr. Stafford chose Mr. Trenkle because Mr. Trenkle resides on the West Coast of the United States while Ace is located on the East Coast. So, as Mr. Weinbrecht described to Mr. Pearson, Mr. Trenkle would be an impartial umpire.

55. All three surveyors worked for Ace on other matters, creating a conflict of interest that resulted in prejudice to Mr. Pearson.

56. Mr. Weinbrecht was deeply entrenched with Ace. In December 2025, ten months into the survey process, Mr. Pearson received for the first time a report Mr. Weinbrecht authored on February 28, 2025, which had been addressed to Mr. Trenkle but not previously disclosed to Mr. Pearson. In that report, Mr. Weinbrecht admitted to Mr. Trenkle: "George [Stafford] and I have had a great relationship for over twenty years."

57. In December 2025, Mr. Weinbrecht also claimed he was not Mr. Pearson's surveyor, stating: "[Ace] is a client of mine[.]"

58. This revelation meant that Mr. Weinbrecht and Mr. Stafford, who were supposed to provide independent and opposing views to the umpire about the value of the Vessel's engine damage, were in fact long-time associates with a shared professional interest in maintaining their relationship with Ace. This undisclosed conflict compromised the selection process for an impartial umpire, who himself worked for Ace on other matters.

59. The claim review process was further characterized by unreasonable delays and a lack of disclosure. Mr. Pearson was told repeatedly for ten months that Mr. Trenkle's report was forthcoming, but Mr. Pearson was kept entirely in the dark.

60. During that ten-month period, Mr. Pearson and his insurance agent contacted Mr. Weinbrecht and Ace, seeking progress reports on the survey process. Mr. Pearson received no progress reports.

61. Although Mr. Weinbrecht represented in February 2025 that he would act as Mr. Pearson's surveyor and submit a report to the umpire, Mr. Trenkle, Mr. Pearson later discovered, in December 2025, that no such report had been submitted on his behalf.

62. Mr. Pearson then submitted documentation of damage to the Vessel to the umpire.

63. On January 8, 2026, Mr. Trenkle notified the parties that he would issue his report within two weeks, but he did not do so.

64. Mr. Trenkle informed the parties that he had not made progress on the survey process during the February to December 2025 period due to personal reasons. Mr. Weinbrecht informed Mr. Pearson that Mr. Trenkle also delayed his report because he was unsure of his responsibilities as umpire or whether he would be paid for work he had completed.

65. On February 9, 2026, a year after the surveyor process began, Mr. Trenkle issued a report that mirrored Ace's original denial, which Mr. Pearson's records refute and which ignores the expert findings from HDS that the Vessel's engine damage is causally connected to the heat soak event during the April 2022 grounding.

66. The umpire improperly rendered opinions on whether the April 2022 grounding event caused the damage to the Vessel's engines—which the survey clause does not contemplate—and did not value the damage, which the survey clause contemplates as the only purpose of the survey process.

67. By forcing Mr. Pearson into a dispute resolution process overseen by Ace's own professional associates, Ace stripped Mr. Pearson of any meaningful opportunity to have his claim heard in a fair and neutral process.

68. Ace's conduct throughout the claim review process demonstrates a deliberate effort to shield itself from its clear contractual obligations.

69. Among other failures, Ace's surveyor, Mr. Stafford, never visited the HDS repair shop to inspect the internal components of the Vessel's engines for damage, nor did he inspect, specifically, the 17 cracked cylinder heads.

70. Mr. Pearson trusted a dispute process that was compromised from the start by undisclosed conflicts of interest. By relying on a biased panel of insiders to justify a groundless denial, Ace violated its obligations to Mr. Pearson.

71. Ace subjected Mr. Pearson to a procedural sham designed to ensure a predetermined outcome in Ace's favor.

72. As a result of Ace's actions, Mr. Pearson has been forced to exhaust his personal savings to repair a loss that falls squarely within the scope of his coverage under the Policy.

## V. CLAIMS FOR RELIEF

### A. Claim One: Declaratory Judgment

73. Mr. Pearson incorporates by reference paragraphs 1–72 as if fully set forth herein.

74. The April 2, 2022, to April 2, 2023, replacement value Policy was in effect during the April 2022 grounding event that caused engine damage to the Vessel.

75. If the Vessel is partially damaged, the replacement value Policy provides that Ace "will pay the reasonable cost to repair or replace, whichever is less, the damaged parts[.]"

76. The replacement value Policy "insure[s] ensuing covered loss due to fire, explosion, sinking, demasting, collision or stranding[,]" and it "provide[s] coverage for damage to engines[.]"

77. The latent damage to the Vessel's engines is a covered loss under the Policy.

WHEREFORE, Mr. Pearson prays that the Court declare that the latent damage to the Vessel's engines is a covered loss under the Policy, and that Ace must therefore indemnify Mr. Pearson for the costs of repair or replacement of the Vessel's engines.

### B. Claim Two: Breach of Contract

78. Mr. Pearson incorporates by reference paragraphs 1–77 as if fully set forth herein.

79. The April 2, 2022, to April 2, 2023, replacement value Policy was in effect during the April 28, 2022 grounding event that caused engine damage to the Vessel.

80. Ace has continued to insure and presently insures the Vessel.

81. If the Vessel is partially damaged, the replacement value Policy provides that Ace "will pay the reasonable cost to repair or replace, whichever is less, the damaged parts[.]"

82. The replacement value Policy "insure[s] ensuing covered loss due to fire, explosion, sinking, demasting, collision or stranding[,]" and it "provide[s] coverage for damage to engines[.]"

83. The latent damage to the Vessel's engines is a covered loss under the replacement value Policy.

84. Mr. Pearson promptly reported the April 2022 grounding event to Ace, and notified Ace of damage to the Vessel's engines at that time.

85. Mr. Pearson, after following the instructions of experienced mechanical support providers, diligently maintained the Vessel.

12

86. HDS's December 2024 inspection of the Vessel uncovered latent damage to the Vessel's engines, which experienced mechanical support providers concluded was caused by the April 28, 2022 grounding event.

87. In early 2025, Mr. Pearson promptly reported HDS's findings regarding latent engine damage and the costs of repair to Ace and requested coverage.

88. On February 18, 2025, Ace denied coverage.

89. The replacement value Policy is a valid and enforceable contract.

90. Mr. Pearson performed all of his obligations under the Policy.

91. Mr. Pearson promptly reported the damage to the Vessel's engines both immediately after the April 2022 grounding event and after further internal inspection in December 2024 uncovered latent damage to the engines that was caused by the grounding event.

92. The engine damage constitutes a covered loss under the replacement value Policy.

93. Ace materially breached the replacement value Policy when it denied coverage for the engine damage.

94. As a result of Ace's breach of the replacement value Policy, Mr. Pearson has suffered damages in excess of $500,000.

WHEREFORE, Mr. Pearson prays that the Court award him damages in excess of $500,000 for Ace's breach of contract, and all other appropriate relief.

**C.  Claim Three: Breach of the Implied Covenant of Good Faith and Fair Dealing**

95. Mr. Pearson incorporates by reference paragraphs 1–94 as if fully set forth herein.

96. The April 2, 2022, to April 2, 2023, replacement value Policy was in effect during the April 28, 2022 grounding event that caused latent engine damage to the Vessel.

97. The replacement value Policy includes an implied covenant of good faith and fair dealing.

98. The implied covenant of good faith and fair dealing prohibits a party to a contract from depriving another contracting party of the benefits of his bargain.

99. Ace had the responsibility under the replacement value Policy to, in good faith, fairly and neutrally investigate Mr. Pearson's report of engine damage to the Vessel after the April 2022 grounding event.

100. Despite Mr. Pearson's report of engine damage, Ace did not fairly or neutrally investigate the claim or direct mechanical technicians to deconstruct the Vessel's engines in search of internal damage.

101. Ace improperly relied on a non-dispositive survey process—the limited purpose of which was meant to only value the amount of the covered loss (*i.e.*, the engine damage).

102. Ace also abused the claims review process by failing to fully and forthrightly communicate to Mr. Pearson his responsibilities under the replacement value Policy and any conflicts of interest Ace had with individuals involved in the survey process.

103. Further, Ace, intentionally or unintentionally, caused unreasonable delay in resolving Mr. Pearson's claim for coverage.

104. Accordingly, Ace's exercise of contractual discretion was arbitrary and unreasonable.

105. Ace's acts resulted in damage to Mr. Pearson, including but not limited to the costs associated with the survey process and for unnecessary expenses related to it.

106. Ace's acts deprived Mr. Pearson of the benefit of his bargain under the replacement value Policy; that is, for a timely, fair, and neutral claims review process, conducted in good faith, that does not incur unnecessary expenses.

107. By depriving Mr. Pearson the benefit of his bargain, Ace breached the replacement value Policy's implied covenant of good faith and fair dealing, causing Mr. Pearson harm.

WHEREFORE, Mr. Pearson prays that the Court award him damages in an amount to be determined at trial, and all other appropriate relief.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Declare that the 2022–2023 replacement value Policy provides coverage for the damage to the Vessel's engines;
2. Award Plaintiff compensatory damages in excess of $500,000;
3. Award Plaintiff pre- and post-judgment interest;
4. Award Plaintiff costs and disbursements;
5. Award Plaintiff attorneys' fees to the extent permitted by the parties' agreements or law;
6. Grant such other and further relief as the Court deems just and proper.

## Jury Demand

Plaintiff hereby demands a jury to the extent permitted by law.

Dated: February 17, 2026
New York, New York

          Respectfully submitted,

          */s/ William A Brewer III*
          William A. Brewer III
          **BREWER ATTORNEYS & COUNSELORS**
          750 Lexington Avenue, 14th Floor
          New York, New York 10022
          Telephone: (212) 489-1400
          Facsimile: (212) 751-2849
          wab@brewerattorneys.com
          **ATTORNEYS FOR PLAINTIFF**
          **MATTHEW M. PEARSON**